IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:17-CR-72-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| GARRETT GRIMSLEY | ) | |

Garrett Grimsley ("Garrett") comes before the Court for sentencing after having pleaded guilty to transmitting a threat in interstate commerce, in violation of 18 U.S.C. § 875. The character letters, as well as the Pre-Sentence Report ("PSR") provided to this Court show that Garrett, who was born on Fort Bragg, North Carolina and grew up in Wilmington, North Carolina, is a hardworking, intellectually curious, and caring person who has overcome personal hardships in his life to become a college graduate with a degree in computer science and had even secured employment as a software engineer in the Research Triangle Park region of North Carolina.

Garrett's conviction is based on his immature and impulsive early morning decision—while involved in an irreverent online chat with a friend who also shared Garrett's interest in immature, dark humor—to make a social media post that was intended to be a quick prank or hoax. Garrett is remorseful that at least one person who saw the post took it post seriously and fully accepts responsibility for his wrongdoing. The Government's investigation and discovery disclosures in this case show that Garrett's social media post that is the basis for his conviction was consistent with dark, politically incorrect humor shared on video game websites or message boards such as 4chan.org. Garrett is an avid video game player. Furthermore, the

investigation showed that Garrett does not believe in Islam, does not actually speak Arabic, has never been to the Middle East, and, as one friend described him, is a young man who is constantly joking around and is a huge President Donald Trump supporter. In fact, the government concedes in the plea agreement that Garrett had no intent to carry out any kind of violent act that was suggested in the social media post.

Given the circumstances of his case, his character references, the permanent stigma and loss of valuable civil liberties flowing from his felony conviction, the loss of his job as a software engineer as a result of his arrest, and the other relevant factors pertinent to sentencing, a just and sufficient—but not greater than necessary—sentence for Garrett's offense is a term of imprisonment that is satisfied by the nearly one year that he has spent in pre-trial and pre-sentencing custody since his arrest, coupled with a term of supervised release.

## FACTUAL BACKGROUND

### A. Garrett's upbringing, education, and beginning of his career.

Garrett was born in Fort Bragg, North Carolina and raised in Wilmington, North Carolina. His parents were both serving in the military. His mother has worked as a private care nurse and still serves in the National Guard. His father is a fireman and also has a farm. His mother and father divorced back in 2003. While his mother was deployed, Garrett and his siblings would stay with their grandparents when his father had to work firefighting shifts. Garrett grew up learning how to responsibly use firearms.[1]

---

[1] Agents found a semi-automatic rifle in Garrett's apartment in Cary, North Carolina. He purchased that rifle years before the incident that led to this case, and the rifle had a trigger lock on it. Furthermore, Garrett did not have a key to that trigger lock in Cary, North Carolina.

In high school, Garrett was president of the school Computer Service and Information Club and regularly played video games and ultimate Frisbee. Garrett graduated high school in 2008. After high school he worked landscaping in the summers and attended community college. He lived with his mother and stayed at her house alone while she was deployed. He spent a significant amount of time playing video games. He worked only seasonally and most of his social contacts took place in online gaming. In community college he took general education classes but he did not apply himself. Back then, Garrett suffered from seasonal affective disorder. He slept a lot of the time during the late fall and winter months and had trouble with motivation. He said he did not attend his classes and made failing grades. He also played less video games. He remained in community college for five years.

After finally getting treatment for seasonal affective disorder, he completed community college and transferred to the University of North Carolina at Wilmington in 2013, where he did well and graduated with a bachelor's degree in computer science in 2016. While in school in Wilmington, he worked delivering Chinese food and repairing computers for the school. He continued to live at home. He was treasurer of the sailing club at school. The character letters provided to this Court describe Garrett's work ethic and ingenuity, including becoming the de facto IT person for the Chinese food restaurant where he worked his way through college.

After graduating from college, Garrett landed a job as a software engineer in Cary. He moved to Cary, staying at first with friends and then he got his own apartment. Garrett enjoyed his life in Cary, felt good about his work, and had friends centered around video gaming. He also enjoyed paddle boarding and lived near a lake which he could walk to from his apartment. He also went to a game club two nights a week.

Garrett travelled to China, South Korea, and North Korea in 2015. He was visiting friends from college who got jobs teaching English in South Korea. From China, he was able to go on a tour of North Korea. Unsurprisingly, the North Korea tour was a guided tour run by its government. One character letter submitted to this Court from a long time friend who is currently teaching in Japan shows that Garrett planned on visiting his friend and touring Japan as well before this incident arose out of his immature interest in absurdist humor.

Early in the morning on February 19, 2017, Garrett was engaged in an online chat with a friend who shared his interest in politically incorrect, absurdist humor. His friend sent him utterly tasteless, dark humor videos of the Jalal brothers who dress up in Middle Eastern attire and do pranks where they pretend to be terrorists (such as dropping a bag near someone in a park and running off). His friend told him about the Whisper social network app that his friend had used to make a post based on a popular meme found on the 4chan.org website that is popular with video gamers. In less than an hour, Garrett made the post on Whisper based on a meme found as well on 4chan.org that is the basis for this offense. Despite his high-level computer skills, Garrett did not make any attempt to mask his IP address (which was connected to his apartment address) or leave his apartment to thwart the geo-location feature on the Whisper app. Garrett sent screen shots of what he posted on Whisper to his friend. He and his friend started joking, as they had a history of joking on this topic, that Garrett would wind up under investigation for his post.

## SENTENCING ANALYSIS

I. **Guidelines Issues**

The recently-disclosed final PSR suggests an advisory sentencing guideline range of 10 to 16 months. Garrett respectfully contends that his guideline range is lower. At the very

most, Garrett's offense level should be 10 because he did not obstruct justice (under the meaning of the advisory Guidelines) by running an encryption software tool, a data protection (not destruction) measure that was part of his standard practice given his background in computer science and cyber-security.

Lars Daniel, a digital forensics expert at Guardian Digital Forensics, has executed an affidavit, attached to this memorandum, explaining that encryption is not data deletion but instead a security measure to protect data from unauthorized access. Importantly, encryption does not overwrite, or delete, logical data. Logical data is data on a computer that is accessible by the operating system (and, therefore, the user). Encryption software (as well as other types of computer activity) can overwrite unallocated space on a hard drive, but that is still not overwriting logical data, that is data that is accessible by the user. *See* Exhibit A, Affidavit of Lars Daniel, digital forensics expert. Thus, if an encryption program happens to overwrite any kind of data, that would be data that was in the unallocated space and no longer accessible to the user anyways.

Encryption is a recommended tool for securing data on anyone's computer in an age where hackers, even in foreign countries, can steal data and commit identity theft via the internet. Encryption is the cyber equivalent of putting a physical file in a safe. Encryption is widely used by law enforcement agencies, private enterprises, and legal entities to protect data. The American Bar Association, on its Tech Show 2018 website has provided an overview on encryption, has recommended that attorneys embrace encryption and has described using it as converting readable data into a form that cannot be read and then, when needed, converting it back into a readable form through a decryption key. Available at, https://goo.gl/JZCvJs. Garrett had a practice of encrypting the information on his computers because he is a software developer and understands best practices for securing data on one's computer(s) through encryption tools. Garrett did not remove the hard

5

drives and physically destroy them or hide his computers, even though he had the capability of taking apart a computer to remove a hard drive in less than 5 minutes.

Using an encryption tool to secure data is not the functional equivalent of being the destruction or concealment of evidence relevant to an investigation as contemplated by the obstruction sentencing enhancement under U.S.S.G. § 3C1.1, Application Note 4(D) ("destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender…").

Additionally, Garrett did not actually think he was under investigation when he chatted on Facebook with his friend that he thought he saw a police van outside of his apartment while he was running an encryption tool on his computer hard drive. They had an ongoing history of joking about whether they would wind up under investigation due to their satirical and politically incorrect (and socially insensitive) commentary as well as internet research on controversial topics. This ongoing joke about being under investigation is reflected in the FBI's interview of this friend.

If Garrett had wanted to destroy the data on his computers, that is engage in conduct that would rise to the level of obstruction (that is assuming he actually thought he was under investigation where an arrest was imminent), he would have either physically destroyed the hard drives (e.g., a hammer or a drill) or run a program that would overwrite data (and permanently

delete the data) without running encryption. That is because encryption is a slow process. In this case, it would have taken several days for Garrett to run his encryption tool on the appx. 4 terabytes of hard drives he had in his apartment. Moreover, when the police arrived the following afternoon, his encryption tool had only completed 63 % of his 500 GB hard (and he had several more hard drives to go). The only reason to encrypt data versus simply overwriting the data is if one wants to preserve the data for future use.

Finally, based on a Lexis Nexis search, the undersigned is not aware of any reported case where the use of an encryption tool was used as a basis for applying the obstruction enhancement under U.S.S.G. § 3C1.1.

## II     A non-custodial sentence is just and warranted under 18 U.S.C. 3553(a).

The Guidelines are just one factor that the Court is directed to consider at sentencing. As the Court is aware, the Guidelines are not presumed to be reasonable in the district court. *See Gall v. United States*, 128 S. Ct. 586, 596-97 (2007). The Court is aware of those other factors set forth in Section 3553, and the relevant ones discussed below all support a sentence where Garrett does not serve any more time incarcerated but instead is placed on supervised release with special conditions.

### A. *Garrett's history and personal characteristics warrant a sentence where he does not serve any more time incarcerated but instead is placed on supervised release.*

Garrett's history and character show that he made an aberrant, terrible, and impulsive decision driven by sheer immaturity and a failure to appreciate that his interest in absurdist humor could lead to a severe disruption in his life and could scare someone who does not actually know him. But Garrett is also a very intelligent, hardworking, and caring young man, constituent components of who he really is at his core as shown by the character letters

7

submitted to this Court and the PSR. One court aptly summarized the importance of the consideration of a defendant's history and characteristics as part of the analysis under § 3553(a):

> "But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd* 301 Fed. Appx. 92 (2d Cir. 2008). Keeping these principles in mind, the Court should consider the reams of positive character evidence in the record.

Instead of further incarceration (Garrett has been incarcerated since his arrest on February 20, 2017), this Court should place Garrett on supervised release with a conditions, such as community service, that will secure the Congressionally mandated sentencing objective of rehabilitation under 18 U.S.C. § 3553(a).

### 1. **A term of probation with an order for community service is legally permissible and appropriate.**

Additionally, based upon the information contained in this memorandum, and given the mandate of 18 U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a community service order would satisfy the goals of sentencing in this case. A 2005 publication of the Administrative Office of the U.S. Courts described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." *Court & Community: An Information Series About U.S. Probation & Pretrial*

*Services: Community Service*, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (2005). It is recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.* In selecting an appropriate candidate to perform community service, U.S. Probation and Pretrial Services recommends:

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.

*Id.*

In April 2010, the United States Sentencing Commission submitted to Congress proposed amendments, which went into effect November 1, 2010. One of the results of those amendments was to increase a judge's ability to impose sentences that include alternatives to incarceration. In its official submission to Congress, the Sentencing Commission explained:

> The amendment is a result of the Commission's continued multiyear study of alternatives to incarceration. The Commission initiated this study in recognition of increased interest in alternatives to incarceration by all three branches of government and renewed public debate about the size of the federal prison population and the need for greater availability of alternatives to incarceration for certain nonviolent first offenders.

Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary at 2-3 (April 30, 2010).

Garrett is an outstanding candidate for a community service condition. His former boss at the Chinese restaurant, where Garret worked his way through college delivering food, spoke

9

of Garrett's ingenuity at solving computer related and other issues for this small business. Garrett's skills in computer science would be indispensable to numerous non-profit or charitable enterprises. Rigorous and appropriately structured community service will serve the needs of justice very effectively in this case, by taking his time and expertise and putting them to use in a constructive and useful manner. For many reasons, the Court should sentence Garrett to a period of incarceration that is satisfied by the time he has spent in custody already and be placed on supervised release conditioned upon substantial community service. This sentence represents the best use of his talent and work ethic to benefit non-profit organizations and other charitable endeavors.

Finally, a term of incarceration is not required to provide Garrett with "needed educational or vocational training, medical care, or other correctional treatment." In fact, incarceration would undeniably have the unintended consequence of delaying Garrett from securing new employment, which is his path to becoming a productive member of the community again.

## CONCLUSION

Accordingly, the Court should impose a sentence of incarceration that is deemed to have been served by the time he has already spent in custody (nearly one year), and placed on supervised release that is supplemented with special conditions appropriate to his offense and that would assist the community.

Respectfully submitted, this 4th day of January, 2018.

                                      TARLTON | POLK P.L.L.C.

                                      /s/ Raymond C. Tarlton
                                      RAYMOND C. TARLTON
                                      150 Fayetteville Street, Suite 930
                                      Raleigh, North Carolina 27601
                                      Telephone: 919.890.3079
                                      Fax: 919.400.4200
                                      E-mail rtarlton@tarltonpolk.com
                                      N.C. State Bar No. 38784
                                      LR 57.1 Counsel (Retained)

                                      *Attorney for Defendant Garrett Grimsley*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on the following parties via CM/ECF:

Jason Kellhofer
Assistant United States Attorney
310 New Bern Avenue
Suite 800
Raleigh, North Carolina 27601

Respectfully submitted, this the 4th day of January, 2018.

TARLTON | POLK P.L.L.C.

/s/ Raymond C. Tarlton
RAYMOND C. TARLTON
150 Fayetteville Street, Suite 930
Raleigh, North Carolina 27601
Telephone: 919.890.3079
Fax: 919.400.4200
E-mail rtarlton@tarltonpolk.com
N.C. State Bar No. 38784
LR 57.1 Counsel (Retained)

*Attorney for Defendant Garrett Grimsley*